# CAROLINA MOTOR CLUB, INC.

## EMERGENCY ROAD SERVICE INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT (the "**Agreement**") is made and entered into in Charlotte, North Carolina this day of 2019-11-11 , by and between CAROLINA MOTOR CLUB, INC., a North Carolina nonprofit corporation ("**Club**"), and Josh Sigler of PALMETTO TOWING AND RECOVERY OF HHI, LLC , ("**Station**").

### STATEMENT OF PURPOSE

Club, which is authorized to do business in North and South Carolina and is affiliated with the American Automobile Association ("**AAA**"), has as one of its purposes the providing of emergency road service to its members and members of other affiliated AAA motor clubs.

Station has heretofore provided emergency road service to such members pursuant to an earlier agreement which has either terminated or is hereby terminated and is of no further force or effect.

Station represents to Club that it has the qualifications, capabilities, facilities and services to render said emergency road service to such members of Club, and of other affiliated AAA motor clubs, and desires to provide such services, pursuant to this Agreement.

NOW THEREFORE, for and in consideration of the aforementioned Statement of Purpose, the mutual covenants and promises of the parties set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confirmed, the parties agree as follows:

1. **Engagement of Station.** Subject to the terms of this Agreement, Club engages Station as an independent contractor, within a geographic area bounded by points one hundred (100) miles in any direction from Station's facility (the "**Service Area**"), to provide emergency road service, as that term is described in Club's service provider manual (which has been provided to Station and is hereby incorporated herein by reference) and with any future modifications to the same provided to Station (the "**Club Manual**"). The Club Manual, along with other guidelines, rules and procedures provided to Station, from time to time, by Club (including, but not limited to directives from AAA) are collectively referred to as the "**Road Service Guidelines**". Such services (the "**Services**") shall be provided for (i) any member of Club, (ii) any member of any other affiliated AAA motor club or (iii) any person or entity for whom Club requests Station to provide Services (the "**Customers**"). Station agrees to provide said Services in the manner set forth herein and in the Road Service Guidelines (and in full compliance with all Federal, state and local laws regulating or pertaining to Station's operations or the Services hereunder). Station agrees to perform, and to cause all employees of Station ("**Employees**") to perform, the

Services in a prompt, timely and professional manner, in conformity with the standards established by Club, from time to time, but independently of supervision or control by Club.

2. **<u>Representations of Station</u>.** In conjunction with Club agreeing to so engage Station as an emergency road service independent contractor, Station represents to Club, and agrees, as follows:

    (a)    Station has the qualifications, capabilities, facilities and services as set forth on the Station contractor inspection report (the "**Inspection Report**"), the current version of which is attached hereto as **<u>Exhibit A</u>**;

    (b)    Station shall submit supplemental Inspection Reports as and when requested by Club, which reports must be satisfactory to Club, in order for Station to continue rendering services hereunder;

    (c)    Station shall at all times maintain the qualifications, capabilities, facilities and services as set forth on the then current Inspection Report and as required under the Road Service Guidelines;

    (d)    Station will perform the Services using only Employees; <u>provided</u>, <u>however</u>, that limited use by Station of subcontractors may be permitted with the advance written consent of Club. In the event Club gives such advance written consent, Station (i) shall indemnify and hold Club harmless, in accordance with Paragraph 12 hereof, from and against, and pay, all obligations incurred by Club arising out of (or related to) that subcontracting relationship, including any claims associated with workers compensation coverage or lack thereof, and (ii) shall continue to be liable and responsible for performance hereunder as if any personnel of the subcontractors are Employees of Station;

    (e)    Station warrants that each Employee is suitable to perform the Services in accordance with the standards hereunder and that Station has carried out a thorough background check of each Employee for that purpose, pursuant to Club's Background Check Requirement Acknowledgment, attached hereto as **<u>Exhibit B</u>**;

    (f)    Station maintains (and will maintain throughout the term of this Agreement) insurance required by law and otherwise sufficient to protect the interests of Station, Club, affiliated AAA motor clubs and Customers hereunder, including, without limitation, workers compensation, liability, disability, unemployment and vehicle insurance and the specific insurance coverages specified in Paragraph 12 hereof;

    (g)    Station shall diligently and in good faith use its best efforts to perform the Services hereunder, based on Club's requirements and consistent with the various policies, procedures and philosophies of Club that have been provided to Station;

(h)     Station shall use reasonable efforts to commence performance of the Services hereunder within a time prescribed by Club, following notification of any Customer's need for such Services;

(i)     Station shall maintain, and cooperate with Club in maintaining, good relations with Customers and members of Club, as well as with affiliated AAA motor clubs, their members and the public at large;

(j)     In all respects, Station shall conduct its business in compliance with the highest ethical business standards; and

(k)     Station does not have, and shall not hold itself out as having, any right, power or authority in any manner to create any contract or obligation, either express or implied, on behalf of, in the name of, or binding on, Club.

3.     **Charge-Backs for Service Failures**.     If Station fails to respond to a call to assist a Customer, is not accessible when Club attempts to contact Station about a call, and/or declines to assist a Customer in a timely fashion, Club reserves the right, in its discretion, to charge Station an amount representing the cost to Club of making other arrangements to assist the Customer, including but not limited to all amounts charged to Club by alternate towing and/or roadside assistance services.     Station hereby acknowledges and agrees that any such charges may be offset against, and credited to, any compensation or other amounts due to Station hereunder.

4.     **Limited License for Marks**.     Club grants Station a limited license to use the AAA trademarks, insignias and Club emblems (the "**AAA Emblems**") on its equipment, as directed by Club.     For this purpose, Club will make available to Station the AAA Emblems, which Station agrees to keep on its vehicles used in rendering Services pursuant to this Agreement.     The AAA Emblems are property of AAA.     During the term of this Agreement, Station shall use the AAA Emblems only in conformance with the specifications set forth by AAA from time to time, including the Road Service Guidelines. It is expressly agreed between the parties that AAA retains full ownership of the AAA Emblems and registrations thereof.

(a)     Standing Guidelines.     Station may use the AAA Emblems so long as the words "Emergency Service", "Emergency Road Service" or "Roadside Assistance" appear in conjunction with the AAA Emblems.     The use of the AAA Emblems in Station's trade name is not permitted, nor is use of the AAA Emblems permitted in Station's white pages telephone directory listing.

(b)     Return of Emblems Following Termination.     Immediately upon expiration, cancellation or termination of this Agreement, Station agrees to discontinue the use of the AAA Emblems in any manner whatsoever and to surrender any material containing the AAA Emblems to AAA or Club, including without limitation, at Station's own expense, remove from its premises, vehicles, printed material, telephone directory listings and any other places, all AAA Emblems and any and

Revised 08-19 JP

3

all indications that it is in any way affiliated with Club or AAA. Station shall, upon termination of this Agreement, also return to Club or AAA all AAA Emblems together with any other property belonging to Club or AAA. In the event that Station has not complied with the provisions of this Paragraph 3 within five (5) days after any such termination, Club shall be authorized to enter upon the premises of Station or its property and remove all such AAA Emblems and to take possession of Club and AAA property. Moreover, Club shall also have the right to withhold payment of any sums due Station under this Agreement until the provisions of this Paragraph 3 are complied with by Station. The provisions of this Paragraph 3 shall be in addition to any other rights Club may have, under law or equity, to enforce its rights hereunder.

5. __Not Exclusive Right__. In order to assure the prompt availability of Services, it is expressly understood and agreed that Club reserves and shall have the right, at its discretion, to take whatever steps necessary to ensure service is rendered in accordance with Club performance objectives, including, without limitation (i) to appoint additional emergency road service contractors within the Service Area, (ii) undertake itself, through Club facilities and capabilities or otherwise, to provide Services in the Service Area and/or (iii) alter, by reducing, enlarging, or otherwise changing, the boundaries of the Service Area. Nothing herein contained shall be construed as granting an exclusive right to Station to render any particular service in any particular zone, area or territory or establishing or committing to any frequency or pattern of referrals of Customers to Station.

6. __Preferred Service Provider Program__. As a provider of Services under this Agreement, Station is eligible to participate in the preferred services provider program (the "**Program**") as a preferred services provider ("**PSP**") in the event Station satisfies the eligibility requirements therefor, is designated as such, continues to satisfy those requirements and otherwise is, and remains, in full compliance with this Agreement.

(a) Eligibility Requirements. The Program's eligibility requirements, are, and will be, established from time to time by Club (the "**Eligibility Requirements**"). In general, the Eligibility Requirements will address requirements relating to (i) member satisfaction scores, (ii) uniforms and labeling of equipment, (iii) timely and courteous responses to Customers, (iv) restrictions on providing comparable services to other motor clubs or roadside assistance programs and (v) other operational aspects of the Services deemed by Club to be important elements of PSP designation. The current Eligibility Requirements are set forth on __Exhibit C__.

(b) Designation. Station can apply for designation as a PSP at any time, provided that Station reasonably believes it meets or exceeds the eligibility criteria. Upon Club's receipt of Station's application (on such form as Club may prescribe), Club shall evaluate such application, and if Club determines that the eligibility requirements have been met or exceeded by Station, Club will designate Station as a PSP under the Program pursuant to a designation form provided to Station

("**Designation**"). Only upon execution by Station of the Designation form will Station become a PSP. Any such Designation form is hereby incorporated herein by reference and made a part hereof. Notwithstanding such Designation, Station shall continue to be subject to, and required to comply with, this Agreement. All determinations with respect to eligibility, Designation and continuation of Designation shall be made by Club, in good faith, but in its sole and absolute discretion, such determinations being binding on Station.

(c) <u>Termination of PSP Designation</u>. Station shall continue as a PSP until the earlier termination of the Designation or termination of the Agreement. Designation may be terminated by Club, immediately upon notice to Station, in the event that Station fails to meet or continue to meet any of the Eligibility Requirements. Further, either Club or Station may terminate Station's Designation, without termination of this Agreement, upon thirty (30) days' written notice to the other, for any reason or for no reason. Upon termination of Designation, all duties and benefits under the Program shall cease; <u>provided</u>, <u>however</u>, that this Agreement shall continue in effect unless otherwise terminated in accordance with its terms.

7. **Payment for Services**. Club shall pay Station for "emergency road service" rendered pursuant to, and in accordance with, this Agreement and in conformity with the Roadside Assistance Compensation Agreement and/or other applicable table(s) of rates, as established and amended by the Club from time to time. All claims for payment must be submitted by Station within sixty (60) days of the date any such Services were rendered by Station, supported by such records as Club may require from time to time.

8. **Acceptance of Customer Checks**. Station agrees to accept any valid personal check, up to Two Hundred Fifty Dollars ($250.00), for payment of any additional services or goods which Station may render to specified members, as provided by Club's "Emergency Check Acceptance Policy", as that policy may be changed from time to time. Provided Station follows such policy as to verification and acceptance procedures, Club shall guarantee payment of any checks so accepted by Station.

9. **Customer Complaints**. Station agrees that, in the event any Customer for whom Station has provided Services or any other service for which Customer may have agreed, makes a complaint with regard to the same, Club's representatives shall investigate and resolve such complaint between Station and such Customer. Station agrees to cooperate with Club's representative in this regard and allow such representative access to all records concerning the complaint and to conduct such tests and inspections as such representative may deem appropriate. The decision of Club's representative shall be final and binding upon Station and may include requiring Station to do additional work, refund the sum paid by the Customer, make additional repairs or be responsible for damages or restitution to the Customer.

10. **No Transfer or Assignment by Station**. Neither this Agreement nor any of Station's rights, obligations or duties is transferable or assignable by Station. Moreover, any sale

Revised 08-19 JP

of Station's business, or change in management, control or stock ownership in Station, shall cause an immediate termination of this Agreement.

11.  **Non-Solicitation of Club Personnel**.   The parties acknowledge and agree that Station, through its association with Club as an independent contractor, will acquire a considerable amount of knowledge and goodwill with respect to the business of Club, its clients, vendors, and personnel, which knowledge and good will are extremely valuable to Club and which would be extremely detrimental to Club if used by Station to compete with Club. It is therefore understood and agreed that it is necessary to afford fair protection to Club from unfair competition by Station.   Consequently, as a material inducement to Club to engage Station, Station agrees that during this Agreement and for a period of twelve (12) months after termination of the Agreement for any reason, it shall not, directly or indirectly, for its own benefit or for the benefit of others  solicit for employment, employ, hire, contract with, or otherwise engage any person that was employed or engaged as an employee or independent contractor of Club working in any capacity at any time during the twelve (12) month period prior to termination of this Agreement for any reason.

12.  **Insurance**.   Station shall carry and maintain at its own expense, all insurance required by law and insurance against such risks, in such form and with such insurers as shall be satisfactory, from time to time, to Club.   Station shall submit certificates of insurance showing Club as an additional insured on a primary, non-contributory basis, such certificates of insurance to contain a provision that the insurance company agrees to notify Club of any changes or actions concerning, or cancellations of, such policies ("**Insurance Certificates**").   Such policies shall include, without limitation:

  (a)  Workers compensation insurance coverage for all Employees performing Services, to the extent required by applicable law (regardless in what jurisdiction that might be).   In the event Club gives advance written consent permitting the use of subcontractors to provide Services hereunder in accordance with Subparagraph 2(d) of this Agreement, Station shall (i) require that such subcontractors carry workers compensation insurance on any personnel of such subcontractors and (ii) submit Insurance Certificates of such subcontractors to Club.

  (b)  Vehicle liability insurance on all owned or hired vehicles and Garage Keepers Legal Liability (GKLL)/On-Hook Insurance on a direct primary basis with combined single limits, and a minimum limit, in amounts in accordance with then current Club requirements, as modified from time to time.

  (c)  Garage liability insurance and general liability insurance, with combined single limits in amounts in accordance with then current Club requirements, as modified from time to time.

13.  **Independent Contractor Status**.   It is the intention of the parties hereto that Station shall be an independent contractor.   Accordingly, this Agreement is not intended to, and does not, created any other relationship between Club and Station, including, but not limited to,

employer/employee, principal/agent, partnership or joint venture. Moreover, neither party shall have the right, or be permitted to represent itself as having the right, to bind or obligate the other party in any manner whatsoever. This Agreement does not grant Club control over the operations of Station in the performance of Services hereunder; but merely assures the nature, quality and result of such Services. Station shall be solely responsible for its Employees and all taxes, insurance or other governmental regulations and requirements in the operation of its business and the performance of the Services. Station shall obtain and maintain all licenses, permits and approvals necessary to perform the Services in the Agreement. Station understands and agrees that it and its employees and other personnel will not be covered by Club's workers' compensation insurance, retirement plans, benefit plans, or unemployment insurance while performing the Services under this Agreement.

14. **Indemnification**. Station agrees that it shall defend, indemnify and hold Club, AAA, AAA affiliates and each of their respective affiliates, agents, officers, directors and employees (all of whom, other than Club, are express and intended third party beneficiaries hereof) harmless against, and pay for, all claims, demands, judgments, expenses (including reasonable attorneys' fees), costs, losses, damages, fines and causes of action whatsoever (collectively, "**Claims**") which may be made, sustained, incurred or initiated by any Customer, any Station employee, agent or representative, any third parties or any other person for any matters whatsoever arising out of Station's performance of the Services or any supplemental services provided for under this Agreement, whether or not such Claims arise out of contract or Station's sole, joint or concurrent negligence.

15. **Termination**. This Agreement shall remain in effect from the day and year first above written until January 31 of the second succeeding calendar year, when it shall terminate without further action of the parties (e.g., if executed on January 20, 2012 or August 20, 2012, the expiration date will be January 31, 2014). Notwithstanding the foregoing, however, this Agreement may be terminated at any time, for any reason or no reason, without prior notice, by either party giving written notice of such immediate termination to the other party, except to the extent that Station is a PSP in the Program, in which case, this Agreement shall terminate no earlier than termination of the Designation. Any such termination shall also effect a termination of any Designation applicable to Station.

16. **Miscellaneous**.

   (a)   Cumulative Rights/Waiver.   Each of the several rights, remedies and options reserved to Club hereunder shall be construed as cumulative and not exclusive of any other right allowed at law or in equity.   No waiver by Club of any breach of any provision of this Agreement by Station shall be deemed thereby a waiver of any preceding or succeeding breach of the same covenant or provision.

   (b)   Conflicts with Law.   If there should be any conflict between any provision of this Agreement and any statute, law or ordinance applicable thereto, the latter shall prevail.   However, in such event, the provisions of this Agreement affected

Revised 08-19 JP

thereby shall be modified only to the extent necessary to bring them within the requirements of law, and should any part or paragraph of this Agreement or any provision hereof be held or declared invalid by any court of competent jurisdiction, such invalidity should in no way render invalid or unenforceable any other part of provision hereto not held to be declared invalid.

(c)     <u>Complete Agreement</u>.    This Agreement contains all of the terms, conditions and promises of the parties hereto, and no modification or waiver of any provision hereof shall be valid binding unless in writing and signed by both parties hereto. All Exhibits attached hereto are hereby incorporated herein by reference and made a part hereof.

(d)     <u>Governing Law</u>.    This Agreement shall be governed by the laws of the State of North Carolina and the parties agree that should any court proceedings or actions be commenced, they shall only be commenced in the courts of Mecklenburg County, North Carolina.

(e)     <u>Execution of Agreement</u>.    This Agreement shall be deemed executed first by Station and shall not be valid and binding until executed last by the president or a vice president of Club at Charlotte, Mecklenburg County, North Carolina, and shall be conclusively deemed entered into in said city, county and state.

(f)     <u>Survival</u>.    Each party's obligations under this Agreement, which would require their surviving this Agreement in order to give them full force and effect, shall survive the termination of this Agreement, regardless of the date, cause or manner of such termination.

(g)     <u>Notices</u>.    Any notice required or permitted to be given by either party under this Agreement shall be in writing and may be (i) personally delivered, (ii) sent by a reputable overnight courier service (e.g., Federal Express), (iii) mailed by first class mail or (iv) transmitted by facsimile, telephonically or email, if confirmed by one of the other methods of notice.    Notices will be deemed effective (x) three (3) working days after deposit, postage prepaid, if mailed, (y) the next day if sent by overnight courier or (z) the same day if personally delivered or sent by facsimile, telephone or email as provided above.    All notices shall be labeled and sent to the address of the parties set forth on the signature page hereto, or such other address as shall be provided by a party to the other pursuant hereto.

(h)     <u>Actions Following Termination</u>.    Upon termination of this Agreement, Station shall cease, and shall cause its Employees to cease, performing Services under this Agreement.

*[Signatures appear on next page.]*

Revised 08-19 JP

IN WITNESS WHEREOF, the parties have caused these presents to be executed in their names, all according to authority duly granted, effective as of the day and year first written above.

"**Station**"

PALMETTO TOWING AND RECOVERY OF HHI, LLC

Station facility and notice address:

(STATION'S LEGAL NAME)

E-SIGNED by Josh Sigler
on 2019-11-05 19:53:02 GMT

(SIGNATURE, OWNER, OFFICER)

Josh Sigler                                    Owner

(TYPE OR PRINT NAME AND TITLE)

If mailing address is different than station address, enter mailing address here

"**Club**"

CAROLINA MOTOR CLUB, INC.

Club notice address:
6600 AAA Drive
Charlotte, NC   28212
Attention:
Automotive Services
Director

BY:      E-SIGNED by Judson Patterson
            on 2019-11-08 19:35:53 GMT

Director, Road Service Delivery

AAA Carolinas

BY:   E-SIGNED by George Figueiredo
         on 2019-11-11 14:43:19 GMT

VP, Member Services

AAA Carolinas

Revised 08-19 JP

## EXHIBIT A

## EMERGENCY ROAD SERVICE INDEPENDENT CONTRACTOR AGREEMENT

### Station Contractor Inspection Report

Revised 08-19 JP

## EXHIBIT B

## Background Check Requirement Acknowledgment

As specified in the Agreement, the Services you provide are subject to the terms, conditions and requirements set forth therein, including the Road Service Guidelines. You are hereby advised of the following specific Road Service Guidelines, relative to your performing both (i) a criminal record check (a "**Criminal Check**") and (ii) a motor vehicle record report (a "**MVR Report**", collectively with the Criminal Check, a "**Background Check**") on each of your personnel that provides Services ("**Personnel**").

You are required to conduct Background Checks on all Personnel, in the manner provided below:

1.      You must perform a Background Check prior to hiring any Personnel to perform Services (and thereafter on an annual basis), using a provider from the list which is attached hereto as **Exhibit B-1**, as may be amended, from time to time ("**Background Check Provider**"). Background Checks must be conducted in accordance with best practices and any standards set forth by Club. You must provide any assistance necessary to the Background Check Provider to ensure that Background Checks are conducted in full compliance with these requirements.

2.      As to existing Personnel, you must perform a Background Check (and thereafter repeat such a Background Check on an annual basis) in the same fashion. You will be allowed a transition period in which to complete Background Checks with existing Personnel, but you will timely inform and confirm to Club your progress and prompt completion of Background Checks upon such Personnel.

3.      To be allowed to perform Services, Personnel must satisfy the criteria set forth in the Adjudication Guidelines attached hereto as **Exhibit B-2**, as may be amended, from time to time (the "**Adjudication Guidelines**"), or have otherwise been permitted by Club, in writing, to provide Services, in accordance with Paragraph 6 hereof.

4.      You must make the results of all Background Checks available to Club through a secure, online data site (the "**Site**"). Additionally, you must require that all Personnel sign a written consent, pursuant to which the Personnel acknowledge and agree that the results of their Background Checks will be shared with Club.

5.      You are responsible for paying all fees, costs and expenses associated with conducting the Background Checks, maintaining the Site and the provision of services by the Background Check Provider.

6.      Notwithstanding the general requirement set forth in Paragraph 3 above, Club, in its sole discretion, may elect, in writing, to permit Personnel failing to satisfy the Adjudication Guidelines, to provide Services. You agree to provide any additional information or

Revised 08-19 JP

documentation pertaining to such Personnel, for individualized review, relevant to such election, as requested by Club.

7.   You will conduct all Background Checks, and make all employment decisions, related to your Personnel in accordance, and compliance with all applicable federal, state, provincial, local, municipal and other laws.   You are responsible for carrying out the requirements of the Fair Credit Reporting Act (FCRA) and any other federal or state laws or regulations related to the Background Checks (e.g., sending adverse action notices in the event that an individual fails to satisfy the criteria set forth in the Adjudication Guidelines).   Adverse action notices shall not list or identify Club as the employer of any Personnel or as an entity taking adverse action based on any background check results.

8.   At any time, upon Club's request, you shall certify to Club, in writing, that you are in compliance with all of the terms of this Exhibit.

9.   By signing this Exhibit, you certify that:

   (a)   You acknowledge the requirements set forth in this Exhibit as incorporated into the Road Service Guidelines regulating the provision of Services as defined in the Agreement.

   (b)   You have performed or are performing Background Checks on all Personnel prior to such Personnel providing Services and such Personnel satisfy the Adjudication Guidelines, or have been permitted by Club, in writing, to provide Services, in accordance with Paragraph 6 hereof.

   (c)   If you engage new Personnel, you will perform the Background Checks on all new Personnel prior to such new Personnel providing Services, and you will not allow new Personnel to perform Services unless they satisfy the Adjudication Guidelines, or have been permitted by Club, in writing, to provide Services, in accordance with Paragraph 6 hereof.

   (d)   You will re-perform Background Checks on each Personnel (i) within one (1) year after the date on which the initial Background Check was conducted on such Personnel and (ii) on or before each subsequent one-year anniversary of any previous Background Check.

   (e)   You shall conduct the Background Checks (and provide Club with the results thereof) and make all related employment decisions relative to Personnel, in accordance, and compliance, with the terms herein and in the Agreement.

Revised 08-19 JP

To the extent any of the requirements hereunder conflict with any laws, such provisions are to be construed in a manner resulting in as broad an application as possible while being consistent, and in compliance, with any such laws.

By signing below, you certify that you understand, and are in compliance with, the terms herein.

November 05, 2019

Acknowledged on _____

Josh Sigler

PALMETTO TOWING AND RECOVERY OF HHI, LLC

_____
Station Owner/Manager (Print Name)

_____
Station

E-SIGNED by Josh Sigler
on 2019-11-05 19:53:11 GMT
_____
Station Owner/Manager (Signature)

Revised 08-19 JP

## EXHIBIT B-1

### List of Approved Background Check Providers

HireRight, Inc.
Sterling

Revised 08-19 JP

Case 3:24-cv-00136-RJC-SCR   Document 1-1   Filed 02/06/24   Page 14 of 26

# AAA Carolinas Adjudication Guidelines

| Adjudication Request Status | Explanation |
|---|---|
| **PASS**<br>(Meets Company Standards) | The applicant's background check results do not trigger any of the defined adjudication criteria, allowing the hiring process to continue for the candidate |
| **FAIL**<br>(Does Not Meet Company Standards) | The applicant's background check results have triggered the defined adjudication criteria and the hiring process for the candidate stops. The FCRA pre-adverse letter is sent. |

| General Adjudication Guidelines | |
|---|---|
| ***Criminal Search Depth****:    Determined by the length of search specified by the customer.*<br><br>**Special Note:** *Adjudication will manually calculate a total of 7 years from disposition/conviction date.* | ***Adjudication status included in criminal guidelines*** |

## Social Security Number Trace

| 1 | Valid SSN Trace | **Pass** |
|---|---|---|
| 2 | No data or invalid trace | **Fail** |

## Criminal Search

| 1 | **Special Note:** *Adjudication will manually calculate a total of 7 years from disposition/conviction date. Use submitted date as a base.*<br><br>***Adjudication status included in criminal guidelines.*** | |
|---|---|---|
| 2 | No Data Found | **Pass** |
| 3 | Data Found if **greater than seven (7 years )**<br>Of disposition/conviction date | **Pass** |
| 4 | Any of the following felony convictions in any state in which they have resided or been convicted of such an offense for a period of **no less than the preceding seven (7) years** of disposition/conviction date | |
| 5 | 1.   Any offense that pertains to alteration or removal of a vehicle's identification numbers, theft and/or injury to vehicles, | **Fail** |

Revised 08-19 JP

| | | |
|---|---|---|
| | unlawful possession of burglary tools, petty theft, grand theft, or robbery, arson, extortion, forgery, false imprisonment, and burglary. | |
| 6 | 2. Any offense, the elements of which include inflicting or threatening bodily injury or death to a person or persons. | **Fail** |
| 7 | 3. Any felony offense involving reckless driving; driving under the influence of any drug or alcohol (regardless of whether the incident resulted in bodily injury or death); hit and run; any use, possession or sale of drugs; or evading a police officer | **Fail** |
| 8 | Any of the following felony convictions in any jurisdiction **within twenty-five (25) years of disposition/conviction date**<br>1. Criminal homicide,<br>2. Kidnapping,<br>3. Rape or any other offense treated by the state as a sexual offense, including without limitation, any crime or offense involving child molestation, or requiring the individual register as a sex offender | **Fail** |
| 9 | Deferred Adjudication, Probation before Judgment, Adjudication Withheld, Diversion | **Pass** |
| 10 | All other felony convictions not specifically listed, and all misdemeanor convictions | **Pass** |

**MVR Search**

| | | |
|---|---|---|
| 1 | No Violations | **Pass** |
| 2 | Valid current driver's license | **Pass** |
| 3 | Invalid or expired driver's license | **Fail** |
| 4 | Current suspended license, revoked license | **Fail** |
| 5 | Any felony offense involving reckless driving; driving under the influence of any drug or alcohol (regardless of whether the incident resulted in bodily injury or death); hit and run; any use, possession or sale of drugs; or evading a police officer; for a period of no less than the preceding **(7) years** of disposition/conviction date | **Fail** |

Revised 08-19 JP

| 6 | All other violations, infractions and convictions not specifically listed | **Pass** |
|---|---|---|

**National Sex Offender Registry (NSOR) Search**

| 1 | Information comes back as No Record | **Pass** |
|---|---|---|
| 2 | Registered sex offender | **Fail** |

Revised 08-19 JP

## EXHIBIT C

## EMERGENCY ROAD SERVICE INDEPENDENT CONTRACTOR PSP AGREEMENT

### PSP Eligibility Requirements

In order to be given the status of PSP and to maintain status of PSP, Station must meet the following Eligibility Requirements in addition to other Eligibility Requirements that may be specified by Club, from time to time:

1.      Station must maintain minimum annual member satisfaction scores, as designated by Club from time to time.

2.      Station must use software provided by Club to update and manage service calls efficiently, effectively and in accordance with the Road Service Guidelines, when providing Services to Customers.

3.      Station must use well maintained vehicles that satisfy in full color, branding and other policies, as set forth from time to time in the Road Service Guidelines, when providing Services to Customers ("**PSP Vehicles**").   Club personnel shall be permitted to examine Station's vehicles to assure that any PSP Vehicles being used in the Program are in compliance.

4.      Station Employees must (i) use PSP Vehicles and (ii) wear uniforms that meet the requirements of the Road Service Guidelines, when providing Services to Customers.

5.      The Station shall not enter into or maintain any contract, agreement or other arrangement with any other person or entity to provide roadside assistance, including, but not limited to, any contract, agreement or other arrangement with any motor club, vehicle manufacturer, insurance company, transportation network company or other business or enterprise that offers, provides or facilitates the delivery of roadside assistance, either directly or indirectly, including through a website, mobile application or other form of electronic communication, on a membership, fee for service or other basis (a 'third party company'). The Station agrees to provide roadside assistance only to and through the Club, except that the Station may respond to requests received directly from public agencies, commercial accounts and private individuals, so long as such requests are not received through or facilitated by a third party company. In addition, the Station agrees that neither the Station nor any of its owners, officers, directors, partners, shareholders, managers or supervisors shall directly or indirectly own, engage in or otherwise participate in any separate business or enterprise that offers, provides or facilitates the delivery of roadside assistance or other towing services, except as otherwise agreed in a written endorsement to this Contract signed by both parties. The Station acknowledges that the Station has received additional consideration in respect of the provisions of this paragraph of the Contract.

Revised 08-19 JP

6.     Station must adhere to all Program policies, procedures and modifications thereof, including, but not limited to, the Eligibility Requirements, as may be designated by Club from time to time.

7.     Station must be available to provide Services to Customers at all times unless authorized, in writing, by Club.

8.     Station must report changes in PSP Vehicles and their drivers immediately to Club.

Revised 08-19 JP

| | |
|---|---|
| **From:** | kathy sigler <kathy.palmettotowing@gmail.com> |
| **Sent:** | Friday, January 28, 2022 9:25 AM |
| **To:** | Francisco X. Vega |
| **Subject:** | [EXTERNAL] Re: Re: Good Morning! |

Ok! Thank you. Have a great weekend.

On Thu, Jan 27, 2022 at 10:20 AM Francisco X. Vega <fxvega@aaacarolinas.com> wrote:

Hello Kathy,

Appreciate the follow up. Per your request below, we will start $1,000.00 weekly deductions, effective pay period 1/31/2022. We will need to work to a full repayment in 2022. In good faith and because of our partnership we will follow-up in two weeks for an update and need final payment resolution by March 1st, 2022. Final resolution would include full repayment arrangements to repay the overpayment by end of 2022.

Francisco

**From:** kathy sigler <kathy.palmettotowing@gmail.com>
**Sent:** Wednesday, January 26, 2022 2:13 PM
**To:** Francisco X. Vega <fxvega@aaacarolinas.com>
**Subject:** [EXTERNAL] Re: Good Morning!

Hi!

I am working today .

We are still going through some things .

We can do $1000.00 per week deduction and we will work to find a way to pay more once we have our accountant go through our finances

.

Thanks

Kathy

Sent from my iPhone

On Jan 26, 2022, at 8:43 AM, Francisco X. Vega <fxvega@aaacarolinas.com> wrote:

Good Morning Kathy,

Can you please advise how you would like to proceed? I need to advise our auditing team, I previously advised 1/21/2022 per your request and I need provide an update.

Francisco

**From:** kathy sigler <kathy.palmettotowing@gmail.com>
**Sent:** Monday, January 24, 2022 5:07 PM
**To:** Francisco X. Vega <fxvega@aaacarolinas.com>
**Subject:** [EXTERNAL] Re: Good Morning!

Thank you !

This make sense

Kathy

Sent from my iPhone

> On Jan 24, 2022, at 4:40 PM, Francisco X. Vega <fxvega@aaacarolinas.com> wrote:

> Hello Kathy,

> Please see below screenshot, please advise if you have additional questions.

> <image002.jpg>

> **From:** kathy sigler <kathy.palmettotowing@gmail.com>
> **Sent:** Monday, January 24, 2022 2:49 PM
> **To:** Francisco X. Vega <fxvega@aaacarolinas.com>; Amanda J. Ormond <ajormond@aaacarolinas.com>
> **Subject:** [EXTERNAL] Re: Good Morning!

> Hi,

> We were not paid for 5 weeks between November 14 and December 18th. After battery invoices deducted, I show $21,282.06 was withheld from pay.

> I know that is not far off but we need to agree on that number.

> That number is from the payment summary reports for above dates.

> Let me know what you see on your end.

> Thanks

Kathy

On Mon, Jan 24, 2022 at 2:20 PM Francisco X. Vega <fxvega@aaacarolinas.com> wrote:

Hello Kathy,

Column "F" contains the amount entered in the "COST" field of the "FSL ENROUTE MILES" in step 3.

Total: $184,685.00

Less: $19,900.00 already recovered via deductions for call #11256 on 9/20/2021.

Remaining: $164,785.00

We can arrange for payments for the remaining balance, not to exceed 6 months. We understand it is a large sum, we can arrange for a partial upfront payment and the remainder to be addressed via pay deductions.

I appreciate your review and look forward to a response today. If you have additional questions, please feel to reach out to myself or Amanda.

Francisco

**From:** kathy sigler <kathy.palmettotowing@gmail.com>
**Sent:** Monday, January 24, 2022 10:35 AM
**To:** Francisco X. Vega <fxvega@aaacarolinas.com>; Amanda J. Ormond <ajormond@aaacarolinas.com>
**Subject:** [EXTERNAL] Good Morning!

**CAUTION:** This email originated from outside of the Company. Do not click links, open attachments, or forward
you recognize the sender and know the content is safe.
Please report any suspicious attachments, links, or requests for sensitive information.

I apologize for not sending an email on Friday. I had some computer emergencies with the company I work with so that consumed my day.

In the report that you sent to me, there were two different numbers on the total.

We did have several weeks where pay was withheld. (Total nightmare on my end trying to see what we had actually "paid back')

I did have a chance to go through those calls. Can you verify the Final AAA audit number and also recap the discussion we had on the phone regarding scenarios of returning this money to AAA?

I do have to work today but will get back to you.

Thanks for your help.

Kathy

The information transmitted is intended only for the person(s) or entity to which it is addressed and may contain confidential and or privileged material and should be treated as a confidential AAA Carolinas communication. If the reader of this message is not the intended recipient, you are hereby notified that your access is unauthorized, and any review, dissemination, distribution, or copying of this message including any attachments is strictly prohibited.

The information transmitted is intended only for the person(s) or entity to which it is addressed and may contain confidential and or privileged material and should be treated as a confidential AAA Carolinas communication. If the reader of this message is not the intended recipient, you are hereby notified that your access is unauthorized, and any review, dissemination, distribution, or copying of this message including any attachments is strictly prohibited.

The information transmitted is intended only for the person(s) or entity to which it is addressed and may contain confidential and or privileged material and should be treated as a confidential AAA Carolinas communication. If the reader of this message is not the intended recipient, you are hereby notified that your access is unauthorized, and any review, dissemination, distribution, or copying of this message including any attachments is strictly prohibited.

The information transmitted is intended only for the person(s) or entity to which it is addressed and may contain confidential and or privileged material and should be treated as a confidential AAA Carolinas communication. If the reader of this message is not the intended recipient, you are hereby notified that your access is unauthorized, and any review, dissemination, distribution, or copying of this message including any attachments is strictly prohibited.

EXHIBIT C



August 22, 2022

**<u>Via email & FedEx delivery</u>**

kathy.palmettotowing@gmail.com
palmettotowing@yahoo.com

Palmetto Towing and Recovery of HHI, LLC
30 Hunter Road
Hilton Head, SC 29926

Attn: Josh Sigler - Owner

       **RE: confirmation of Agreement termination**

Dear Mr. Sigler:

This letter is written regarding the Emergency Road Service Independent Contractor Agreement ("Agreement") the parties entered into with an effective date of November 11, 2019.

Palmetto Towing abruptly ceased service for AAA calls without notice on August 5, 2022. On August 8, 2022 Palmetto Towing advised of the intent to terminate the existing Agreement without additional consideration. Specifically, Palmetto Towing (Josh Sigler) advised via text message dated August 8, 2022. . . *"We will continue with $55 base rate for tows and 2.50 enroute and 3.50 towed. Light service 45 plus 2.50 enroute. My base commercial rate is $104.50 aaa has got to get in the game and provide for their providers. I will also dump other roadsides to put you primary first in line. You and I both know our service is outstanding. And would happily continue at a higher rate if not then I guess this is goodbye."* This letter is a formal acknowledgment and acceptance of your notice of termination effective August 5, 2022.

As you are aware, Palmetto Towing currently has an outstanding overpayment balance owed of $134,207. This amount was calculated as follows: the initial overpayment balance was $184,685. An initial repayment of $19,900 was applied on 12/16/2021. You also agreed to pay $1,000 per weekly pay period starting January 31, 2022 and the club would retain any monthly Pay for Performance incentive dollars earned with agreement to repay in full by the end of 2022. As of August 10, 2022, Palmetto Towing current owes $134,207, less amounts outstanding for payment of $26,751.52. This amount will be further offset with any additional monies owed. **<u>Please take immediate action to repay the outstanding overpayment balance of $107,455.48 as soon as possible and not later than 10 days from the date of this letter.</u>**

The Club reserves all of its rights, claims, remedies and damages with respect to this matter and nothing in this letter shall be deemed to be a waiver of any such rights, claims, remedies and damages. If you have any questions, please feel free to contact me at fxvega@aaacarolinas.com.

Sincerely yours,

Francisco X. Vega
Regional Director
The Auto Club Group



**RUBERRY**

RUBERRY STALMACK & GARVEY, LLC

300 South Wacker Drive, Suite 3250
Chicago, Illinois 60606
Main (312) 466-8050 | Fax (312) 466-8055
www.ruberry-law.com

EDWARD D. MIZERA
Direct (312) 466-7239
edward.mizera@ruberry-law.com

August 28, 2023

***Via FedEx and E-mail***

EXHIBIT D

Josh Sigler
Palmetto Towing & Recovery of HHI LLC
30 Hunter Road
Hilton Head, South Carolina 29926
palmettotowing@yahoo.com
kathy.palmettotowing@gmail.com

   Re: *Demand for payment on outstanding balance to Carolina Motor Club Inc. and AAA*

Dear Mr. Sigler:

   This office has been retained by Carolina Motor Club Inc. (the "Club") and the American Automobile Association ("AAA") to recover on payments due and payable to them by your company, under a contract signed on November 11, 2019 (attached here), and pursuant to e-mail discussions your company had with the Club in January 2022 relating to an audit of your account with the Club and AAA (also attached here).

   Specifically, due to overpayments, your company received $184,685 more than it was entitled to on the contract between your company and the Club. After an audit, the amount owing was reduced by providing several credits, and your company agreed to pay $1,000 per week to repay that reduced amount. Such payments commenced accordingly after January 2022. However, by August 2022, your company decided to unilaterally terminate the contract and proposed new terms. My clients did not agree to those terms, but instead acknowledged your company's termination notice in an August 22, 2022 letter (attached here), and demanded payment of an outstanding balance of $107,455.48. That amount remains outstanding.

   **The immediate payment of $107,455.48 is therefore respectfully demanded. Please remit payment to this office, to be made payable to "Ruberry Stalmack & Garvey Client Trust Account," and to be received by us no later than September 15, 2023. If payment has not been received by that date, we intend to bring suit on behalf of Carolina Motor Club Inc. and American Automobile Association and to seek all available remedies, including but not limited to interest on the amount owing.**

   If you have legal counsel, please provide them with this letter. Otherwise, please contact me as soon as possible to discuss this matter. Thank you.

   Very truly yours,

   Edward D. Mizera

Enclosures